48

TEXACO PUERTO RICO, INC., Plaintiff and Appellant, *v.* JUAN T. PEÑAGARÍCANO, ETC., Defendant and Appellee.

No. CE-66-11.      Decided February 21, 1967.

*Beverley, Rodríguez & Reichard,* and *Hermán W. Colberg* for appellant. *Miguel Franquiz Ventura, Eduardo A. Ruiz,* and *José E. Rodríguez Rosaly* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Again before us comes the question of determining, under the circumstances of this case, what constitutes a "going concern" for the purposes of its exclusion from the ambit of the Reasonable Rents Act (17 L.P.R.A. §§ 181–218), and its Housing Regulations, approved December 15, 1964 (17 R.&R.P.R. § 186–27(b)).[1]

We conclude that the trial court erred in deciding that the service station in question was not a going concern when it was leased to Jaime Enrique and Ernesto Enrique Escabí, on the grounds that "Said operation and clientele must be in charge of the lessor to fall under the exception. We believe and decide that the operation or clientele of a lease does not favor it . . . the operation by the lessor is required to the effect that in exchange for the rental stipulated, he is delivering a going concern, with clientele, goodwill, etc., and not a set of equipment or products." We decide, on the contrary, that when said station was leased it was a going concern because its former owner, the Pyramid Products, Inc. (former name of the Regent Petroleum Co.) had operated it years before, subsequently the business facilities were remodeled and it was leased to Benito Beauchamp Lecodet, from whom the Escabís bought the station and some equipment when they leased it from the Regent Petroleum Co. on August 16, 1955, agreeing then on a lease rental of $150 a month. Lastly, the Escabís signed a new lease contract for the business in question with appellant on April 26, 1961, when the business became appellant's prop-

---

[1] That provision of said Regulations provides that it shall not be applied to "(5) The so-called 'going concerns,' as defined by decisions of the Supreme Court of Puerto Rico."

erty as part of the properties of Regent Petroleum Co., which appellant acquired.

■■■ We are not of the opinion that for a commercial or industrial operation to be recognized as a "going concern" it is necessary to establish that the lessor was operating it at the time of making it available to a lessee. In our judgment, it is sufficient if prior to the lease giving rise to this controversy, the lessor or one of its predecessors in title, operated it even though subsequently the business was submitted to substantial improvements by reason of the construction and expansion of buildings as well as the installation of additional equipment and facilities, provided it had not ceased to operate, except for the interruptions caused by the construction work and the installation of the improvements.

In the case at bar, the Texaco Puerto Rico, Inc., owner of a gasoline service station in Post Street, Mayagüez, leased said property to the Escabí brothers on April 26, 1961 by means of a contract entitled "Lease of Business," which included "all the buildings existing in the property, as well as the gasoline service station with all its facilities, installations, improvements, goodwill of the established going concern, including the equipment fully described in the addendum which is made an integral part of this contract. . . ." It was agreed on (a) a year as term of the contract, renewable automatically, unless one of the parties notified the contrary to the other 60 days in advance of the expiration date of the contract; (b) a rate of one cent for each gallon of gasoline bought from the lessor, with a minimum of $170 a month; (c) that the lessee shall not make alterations, removals or constructions in the service station, or change, move or remove tanks or equipment without the written consent of the lessor; (d) that the lessee shall only use the property for the operation of a gasoline service station business; (e) that the equipment installed in the sta-

tion shall be used exclusively for the storage and sale of Texaco products; (f) that the lessee shall not transfer or assign the business, either in whole or in part, without the written consent of Texaco, said contract expiring with the death of the lessee, among other causes; (g) that the lessee shall permit free access to the property to authorized agents of Texaco for the purpose of inspecting the station and the existing facilities thereof, to render the best service and offer the best appearance; (h) that the lease comprised an established and going concern; (i) that this was not a lease for business premises or to establish therein a business or industry belonging to the lessee; and (k) that the property and the equipment in this contract constituted a single unit which has been leased as a business owned by the lessor, which the lessee shall operate as an independent businessman.

On March 24, 1964 Jaime Enrique Escabí complained before the Administrator of the Office of Economic Stabilization that they had "hiked the $150 monthly rent, to a cent for each gallon, which amounts to from $300 to $320 per month, twice the rent" of the business in question. The hearing of the case having been held on April 30, 1964, the Administrator, on June 9 of that year, dismissed the lessor's petition to declare that the property leased to the Escabís was a going concern on the ground that it was necessary that the business were operated by the lessor before leasing it, and that "Neither the Regent Petroleum Co. nor Texaco, operated the service station before leasing it to the Escabís with the buildings, equipment, and facilities existing at present." The lessor appealed to the Superior Court, San Juan Part, which affirmed the decision of said Administrator for the reasons we stated at the beginning of this opinion.

We have had the opportunity to consider what constitutes a going concern in four previous occasions. In *Adm'r of Econ. Stab.* v. *Sup. Ct.; Vélez, Int.*, 75 P.R.R. 419 (1953), we decided that the lease of a business establishment engaged

in the hotel business did not constitute the lease of a business in itself and, therefore, outside the scope of the Reasonable Rents Act, inasmuch as the chattels and furniture inside the hotel were sold separately to the lessee, so that "the purpose of the lease was primarily the renting of the premises where the hotel business was located, and not the business itself independently of the building." In *Heirs of Ramírez* v. *District Court*, 70 P.R.R. 763 (1950), we dealt with the lease of a gasoline station built by the lessor in a lot he owned, leased by him to the Texaco Co. (P.R.), when he finished it; subsequently leased to somebody else who assigned the lease to defendant. We concluded that it was a business not exempt from the provisions of the Reasonable Rents Act because, albeit it was admitted that when the defendant acquired the gasoline station it was a going concern, it did not belong to the lessor but to a previous lessee from whom the defendant bought it; that under such circumstances, the position of petitioners is equivalent to that of a person who prepares a place for business and rents it to another who operates the business. We said that our decisions in *Ortiz* v. *Cesaní*, 68 P.R.R. 382 (1948) and *Orsini* v. *Sánchez*, 67 P.R.R. 809 (1947), are not applicable because in these cases the lessor was operating the business up to the moment he leased it to the defendant, so that they were going concerns not subject to the Reasonable Rents Act.

The evidence in this case showed that originally in the property in question, 100 Post Street, Mayagüez, there was a frame shedhouse "to which a front was made of the material known as 'High Reed'." (meaning high rib—a light construction of a steel mesh expanded and plastered) and "two gasoline pumps were installed there with two small tanks. When this was done an employee of the company, then the 'Pyramid Products, Inc.' was put in charge of the business under the direct supervision of the Pyramid company agent in Mayagüez." The name was afterwards changed

from Pyramid to Regent. Subsequently, Regent expanded the facilities in the premises to provide a modern service station and installed its own equipment and leased it to Benito Beauchamp Lecodet immediately. In August 1955, Regent leased the property to the Escabí brothers. In June 1958, Regent sold all its properties in Puerto Rico to appellant. There was included, among them, the property in question. On April 26, 1961 the Escabís, together with appellant, signed the lease contract of the property which gave rise to this action.

■ As we said at the beginning, for an industrial or commercial operation to constitute a "going concern," and hence, free of the restrictions of the Reasonable Rents Act, it is not an indispensable requirement that the lessor be operating it immediately prior to assigning it to the lessee. Neither the law nor our case law has established such requirement. What is indeed essential is that the business should have been in operation by its owner prior to the lease which gives rise to the grievance or complaint before the Administrator of Economic Stabilization. Once that previous operation has taken place without any interruption except by force majeure or as in this case, the business becomes a "going concern" and as of that moment it does not cease to be so merely because it was leased to subsequent lessees or assigned or sold to other owners, and it is substantially enlarged and modernized during the course of those transactions.

In Spain the lease of industry or business is excluded from the scope of the *Ley de Arrendamiento Urbano*. Castán states (I Castán, *Tratado Práctico de Arrendamiento Urbano* 212):

"It is not necessary, on the other hand:

(a) That the industry be directly operated by the lessor, which would be contrary to the concept of industry because it would become invalid in the first assignment of lease, for-

getting what is in itself objectively considered (judgment of May 10, 1955). Hence, it becomes immaterial whether the business is operated by persons other than the lessor (judgment of June 20, 1955), even though the former operated it as an enterprise (judgment of November 21, 1952), and that the lessor would not have operated the business formally, if it was in charge of persons acting in his behalf or as lessees of the owners of the property (judgments of September 27, 1949 and January 13, 1953)."

The judgment of the Supreme Court of Spain of May 10, 1953 (51 *Jur. Civ.* 150, 161) dealt with the lease of a movie house which had been operated by its owner, thereafter by two lessees during several years, and finally by the third person object of the eviction, until it was closed by the authorities because some particular technical and safety conditions were not complied with. The owner, although he failed to have the lease declared terminated, proceeded to rebuild the business. In his defense he alleged it was a lease of the premises and not of an industry, inasmuch as the *Ley de Arrendamiento Urbano* requires that to constitute an industry the business must be in operation at the time immediately preceding the lease contract, and said operation must have been carried out by the owner of the leased property. Upon deciding it was the lease of an industry, the court stated that:

". . . it being held in the judgment appealed from that the thing leased is an industry, not the business premises, which ground must be dismissed because the thing leased was, besides the premises, a patrimonial unit with life of its own susceptible of being operated immediately, inasmuch as it had all the necessary elements for the exhibition of motion picture films and it was so done by appellant, which was the purpose to which it was devoted, without this concept being affected by the success or failure of the operation, since the lease of an industry is not linked with the certainty of an economic benefit nor with the existence of subsequent leases, for neither the section cited nor the doctrine of the case law, requires that the in-

dustry established in the premises and which is leased be directly operated by the lessor, which would be contrary to the concept of industry because it would become invalid in the first assignment of lease, forgetting what is in itself objectively considered, nor, finally, the alleged interruption in its operation does not exist either insofar as this ground establishes that the show was exhibited on particular dates for the convenience of the business and the benefit of the person who operated the industry, in view of the coincidence of dates between previous leases."[2]

In its judgment of June 30, 1951 (35 *Jur. Civ.* 547), the Supreme Court of Spain held that even though the industry was not in operation at the time the lease was agreed upon, it involved the lease of an industry because its temporary inactivity did not alter its nature since it maintained its particular structure and purpose; that "what is required is that the industry exist previously and that at the time of the execution of the contract, the lessee finding the industry already established in the same premises leased therewith, puts it in operation with the elements delivered to him, even if for the purpose of its utility, advantage, or comfort, he adds some on his own."

In its judgment of September 27, 1949 (27 *Jur. Civ.* 539, 540, 548), said court specifically held that the fact that neither the lessor nor his predecessor have personally operated the industry (flour manufacture) object of the lease "is irrelevant in this suit because at any rate the property and the enjoyment of the industry belonged and still belongs to the defendants and at some previous time to their predecessor, and as such they have been able to lease it without it being contravened by the fact that it was operated imme-

---

[2] See also the judgments of the Supreme Court of Spain of October 16, 1954 (48 *Jur. Civ.* 91, 102, 103); of April 5, 1954 (46 *Jur. Civ.* 623, 635); of November 6, 1953 (44 *Jur. Civ.* 491, 492, 501); of January 13, 1953 (41 *Jur. Civ.* 89, 95); of November 10, 1952 (40 *Jur. Civ.* 443, 444, 447); of October 30, 1951 (36 *Jur. Civ.* 483).

diately by other persons who never acted as owners, but in behalf of, or as lessees of the owners."

In view of the foregoing, the judgment of the Superior Court, San Juan Part, of January 5, 1966 will be reversed, as well as the order of June 9, 1964 of the Administrator of Economic Stabilization, and said court will be ordered to remand the case to said Administrator to proceed in a manner consistent with this opinion.

Mr. Justice Blanco Lugo concurs in the result.

